IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-21 Erie |
| | ) | |
| MARK JOSEPH BRETZ | ) | |

**SENTENCING MEMORANDUM**
**OF THE UNITED STATES**

  Bretz deserves a sentence at the top end of his Sentencing Guidelines range. He coerced and terrorized multiple victims online into providing him naked images while maintaining a child pornography collection that included depictions of very young children being raped and brutalized. He has shown no interest in mental health treatment or maintaining a drug free lifestyle. There is simply no reason for a downward variance in this case.

**Factual Background**

  On June 5, 2018, the FBI in Erie, Pennsylvania received information from Detective Chad Roberts of the Aurora, Colorado Police Department concerning an investigation he was conducting into the on-line sextortion of R.M., a sixteen-year-old female high school student whose year of birth is 2001. Detective Roberts, who is also assigned to the Colorado Internet Crimes Against Children Task Force, informed the FBI that based on his investigation he believed the individual who was contacting R.M. was located in the Erie, Pennsylvania area.

  On April 17, 2018, Detective Roberts was informed by a School Resource Officer at R.M.'s high school located in Colorado, that R.M. was being contacted by an individual over

Facebook Messenger with the user name "Jerry Wilde". During these conversations, "Jerry Wilde" coerced and threatened R.M. to send nude images of herself or else "Jerry Wilde" would send out other nude, previously obtained, images of R.M. to her friends and family. Detective Roberts was provided and reviewed a sample of the Facebook messages sent to R.M. A summary of one of the interactions between "Jerry Wilde" and R.M. follows:

> "Wilde" - "wanna be a bitch? Idgaf" (acronym for "I don't give a f***")

> "Wilde" - "I'll send your pics around and let everyone see ur body u want that?"

> R.M. then asked "Wilde" not to do this and "Wilde" responded that R.M. has one chance to work this out. R.M. asked "Wilde" what he wanted and Wilde then told R.M. to go to the bathroom and do a video call. Wilde told R.M. to put the phone on the toilet, stand up, and take off her hoodie.

> "Wilde" - "If you don't do what I say, I'm going to post those pictures of you and everyone will see"

> "Wilde" - "Go into the bathroom, put me on video, take your hoodie, shirt, bra…"

> "Wilde" then told R.M. to stand up and take off her pants and R.M. responded "anything but that".

> "Wilde" - "Do what I fucking say (R.)!!! U got 10 seconds to do it or I'm sending them 5 seconds 3,2,1 imma sending them".

R.M. was subsequently interviewed by the School Resource Officer and stated that she did not know who "Jerry Wilde" actually was. R.M. denied ever sending any nude images to "Wilde" and did not know what pictures "Wilde" was referring to in his threats. R.M. also stated that she did not take any of her clothes off when she was video chatting with "Wilde". However, in subsequent interviews conducted by the School Resource Officer and by Detective Roberts, R.M. admitted to sending pictures of her breasts via Snapchat to a number of individuals, including individuals whom she did not know. R.M. further disclosed that on at least two occasions, she sent either recorded or live videos of herself exposing her breasts and/or vaginal

area to "Wilde" and/or an individual going by the name "John Helles".  R.M. sent the videos as a result of her being threatened to do so.

On May 3, 2018, Detective Roberts was informed by the School Resource Officer that R.M. had reported that the same individual who threatened her before had contacted and threatened her again using the name "John Helles".  R.M. believed that "John Helles" and "Jerry Wilde" were the same person because they were saying similar things to her and this individual noted that they needed to finish what they had started.  A summary of "John Helles" Facebook messages to R.M. follows:

> "we need to finish this"
> "what we started"
> "the video a few weeks ago"
> "prop the phone"
> "k ill snd the video around then"
> "idgaf R……"
> "the video that I recorded when we video called"
> "this is ur last chance R……  …"
> "do wat I say…"
> "NOW"
> "I SWEAR TO GOD R….."
> "TAKE IT THE FUCK OFF!"
> "FINE IM SNDING THEM"
> "HAVE FUN CUNT"
> "WELP NOW I GOT THE VIDEO OF UR TITS…"

Detective Roberts searched for the Facebook profiles of "John Helles" and "Jerry Wilde" and determined both of the profiles were still active.  On May 3, 2018, Detective Roberts obtained a Colorado state court order for subscriber information regarding the accounts www.facebook.com/jerry.wilde.39 and www.facebook.com/john.helles.5. Detective Roberts then served the Order on Facebook and on May 19, 2018, received a response from Facebook that included IP address login information.  Detective Roberts reviewed the information received from Facebook and determined that the two accounts shared multiple IP addresses, which

indicated that the same person was using both accounts from the same locations. Some of the IP addresses were assigned to a colocation facility in Toronto, Canada. However, the account user also used an IP address that geolocated to Erie, Pennsylvania. This IP address, 174.100.13.148, was owned by Time Warner Cable (Charter Communications) and was used to register the jerry.wilde.39 profile on Facebook on April 17, 2018 at 03:54:55 UTC. The user utilized this IP address to log into that account multiple times in April and May. Detective Roberts also found that the suspect logged into the other Facebook profile, john.helles.5, using this same IP address on May 1, 2018, at 06:17:36 UTC.

On May 24, 2018, Detective Roberts obtained a Colorado state court order for subscriber information relating to IP address 174.100.13.148. Detective Roberts served the order on Charter Communications, and on May 24, 2018, Charter Communications responded to the order with information that indicated IP address 174.100.13.148, during the dates and times relevant to the investigation, was assigned to:

> MARK BRETZ
> xxx Cascade Street (redacted)
> Erie, Pennsylvania 16502-1111
> markbretz1990@xxxxxxxxx (redacted)
> 814-882-xxxx (redacted)

Based upon this information, the FBI obtained a federal search warrant on June 19, 2018, authorizing the search of Bretz's residence in Erie for evidence related to the sexual exploitation of minors in violation of federal law. The federal search warrant was executed on June 20, 2018. Upon arrival at Bretz's residence, and after the presence of law enforcement was made known, the door was answered by Mark Bretz's girlfriend. Shortly thereafter, Mark Bretz was encountered by law enforcement officers within the residence.

The FBI then provided Bretz with a copy of the search warrant and advised Bretz that he was free to leave and was not under arrest. The FBI then asked Bretz if he would be willing to speak with the FBI in private about the investigation. Bretz agreed to speak with the agents on scene. Prior to the commencement of the interview, an FBI agent informed Bretz of his *Miranda* rights and Bretz waived those rights in writing and agreed to answer questions.

During the interview, Bretz disclosed that he has been downloading and viewing child pornography for approximately three years. He also admitted to masturbating to the child pornography when viewing the material. He acknowledged downloading child pornography from IMGxxx.ru (partially redacted). Bretz further disclosed that he used his HP laptop to download the child pornography and then would save the material on a thumb drive. The HP laptop and the thumb drive revealed by Bretz were located within his residence.

Bretz also disclosed that he fantasized about touching children sexually but claimed that he was not considering actually sexually assaulting a child. Bretz also revealed that he had been extorting girls for naked images and videos for approximately one year. Bretz admitted to using Facebook to extort a "shit ton" of girls and acknowledged that he had succeeded in acquiring naked images and/or video via extortion from approximately five victims. Bretz stated that he screen recorded approximately three to four of the victims whom he extorted and kept images or video of these victims on his thumb drive.

Bretz also admitted that R.M. was among the approximately five victims whom he extorted. He further admitted that he utilized the "Jerry Wilde" and "John Helles" Facebook pages to extort R.M. Bretz also admitted that he had attempted to hide his laptop when he realized that the FBI was at his door. The laptop was found in the location where Bretz said he tried to hide it.

5

A forensic review of Bretz's thumb drive revealed Facebook screen captures of two other sextortion victims where Bretz recorded himself explicitly extorting the victims to provide him nude images, which the victims provided. The screen capture videos show the victims in considerable emotional distress prior to providing the requested images under duress. Also located was another screen capture where Bretz attempted to make contact with another girl on Facebook and no connection was made but Bretz's penis is exposed as he attempts to make contact.

Bretz was able to coerce the victims into providing him naked images of themselves by falsely claiming that he already had naked images of the victims. Bretz would then become increasingly threatening and agitated in each of his online communications with the victims such that in their confusion over whether Bretz actually already possessed their images, each victim reluctantly and through tears provided Bretz what he demanded. A review of Bretz's screen captures of each victim revealed them in significant emotional distress. The victims repeatedly pleaded with Bretz to stop. Rather than displaying basic human decency, Bretz increased his hostility until the victims' resistance was overcome.

The forensic examination of Bretz's thumb drive also revealed 315 images of child pornography some of which depicted adult males vaginally penetrating infants with their penis. Also located were photos taken of a girl appearing to be about 12 or 13 sitting on a bus. The forensic exam also located two separate videos taken of a girl – about 10 to 12 - appearing to be walking home from school. These videos were taken from a vantage point inside Bretz's residence looking out the front of the home to the street.

**Argument**

A. **Legal Context**

Numerous courts have emphatically expressed the wretched consequences of child pornography. In *United States v. Goff*, 501 F.3d 250, 258-59 (3d Cir. 2007), the Third Circuit noted:

> Children are exploited, molested, and raped for the prurient pleasure of Goff and others who support suppliers of child pornography. These small victims may rank as "no one else" in Goff's mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are far too real. There is nothing "casual" or theoretical about the scars they will bear from being abused for Goff's advantage.

The defendant in *United States v. MacEwan*, 445 F.3d 237, 249-50 (3rd Cir. 2006), tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs. The Third Circuit was not persuaded, reasoning:

> Congress found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children." Furthermore, "it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials."

*Id.* (citations omitted); *See United States v. Gonzalez*, 445 F.3d 815 (5th Cir. 2006); *United States v. Duhon*, 440 F.3d 711, 718-20 (5th Cir. 2006); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

The district court in *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio,

7

2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child pornography defendant. In denying the defendant's challenge to the legitimacy of the child pornography guideline, the court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

### B. Sentencing Protocol

It is well settled that district courts "must perform three steps in determining the appropriate sentence to impose on a defendant." *United States v. Wise*, 515 F.3d 207, 216 (3d Cir. 2008). First, "a district court must begin the process by correctly calculating the applicable Guidelines range." *Id. (*citing *United States v. Gall*, 128 S.Ct. 586, 596 (2007); *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006)). Second, the court must "formally rule on the motions of both parties and state on the record whether [it is] granting a departure and how that departure affects the Guidelines calculation and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force." *Id. (*citing *Gunter*, 462 F.3d at 237). Third, "after giving both sides the chance to argue for the sentences they deem appropriate, the court must exercise its discretion by considering all of the § 3553(a) factors and determining the appropriate sentence to impose." *Wise*, 515 F.3d at 216-17 (citations omitted). Having set forth the well-established sentencing protocol, the United States will take each step in turn.

### C. Applicable Guideline Range

Both parties agree that the Sentencing Guidelines range applicable to Bretz is 121 to 151 months of incarceration to be followed by a term of supervised release of not less than five years to life.

### D. Departures

The United States is not seeking an upward departure. A sentence within the 121 to 151 month guideline is justified, reasonable, and appropriate in this case. Bretz does not seek a downward departure based on any specific provision of the Sentencing Guidelines. Rather, Bretz is seeking a downward variance to a sentence of ninety months, thirty-one months below the bottom of his guideline range

Bretz claims that his criminal history score overstates the seriousness of his prior conduct. He conveniently ignores that he received no criminal history points for his four juvenile adjudications. Bretz criminal history is longstanding and demonstrates his consistent refusal to be law abiding. It is not a basis for a lower sentence.

Bretz takes issue with the imposition of two offense levels for his use of a computer to commit the crimes. It is well established that the use of a computer enhancement does not constitute impermissible double counting. *United States v. Ziska*, 602 F. App'x 284, 289 (10th Cir. 2015). Bretz seeks a downward variance because everyone uses a computer now to commit child pornography offenses. There is significant irony to Bretz's claim. The penalty was enacted to curb the explosion of child pornography on the Internet. The fact that Internet pornography is so pernicious is not a basis to reduce penalties. Indeed, there is no other area of criminal law where, when severe crime becomes more common, the penalties are reduced. This argument also ignores the purpose of the enhancement. Due to the wide dissemination and

instantaneous transmission, computer-assisted trafficking of child pornography is extremely difficult for law enforcement officials to stop. *United States v. Lebovitz*, 401 F.3d 1263, 1271 (11th Cir. 2005) (quoting H.R.Rep. No. 104-90, at 3-4 (1995), as reprinted in 1995 U.S.C.C.A.N. 759, 760-61). Thus, the enhancement for use of a computer aims at punishing *a distinct harm* beyond the mere possession of child pornography. *United States v. Tenuto*, 593 F.3d 695, 698-99 (7th Cir. 2010).

Bretz also claims that his mental health history should result in a reduced sentence. If anything his mental health history and his refusal to get help should result in a higher sentence because it makes him more dangerous to the public. Defense counsel describes Bretz as "troubled" but offers no explanation for why this should result in a lower sentence.

### E. Section 3553 Factors

When sentencing a defendant, the Court's reasoning must be guided by all of the sentencing considerations set forth in 18 U.S.C. § 3553(a), not just those related to a defendant's background. *Wise*, 515 F.3d at 216-17; *United States v. Smith*, 440 F.3d 704, 706 (5th Cir. 2006). In pertinent part, these factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; ...
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for -
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines- ...
(5) any pertinent policy statement-
(A) issued by the Sentencing Commission ...
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to victims of the offense.

18 U.S.C. § 3553(a); *Id.*

Notably, these factors do not involve merely a focus upon the defendant's background and the impact of the sentence on the defendant. Rather, a correct application of these factors to any case involves a balancing of all of the factors, which include the guidelines, the defendant's criminal conduct and its impact upon the victims and not just a consideration of the defendant's background and history.  A solitary focus on only the defendant is certainly not an appropriate manner in which to apply the § 3553 factors to this case.  A full consideration of the § 3553 factors calls for a sentence within the 121 to 151 month guideline range.

    **1.   Nature and Circumstances of the Offense**

Bretz was in possession of hundreds of images and movies of child pornography, which he obtained from the Internet using his computer. His repulsive collection includes numerous images and movies of young children being raped and humiliated.

Bretz was not satisfied with just child pornography.  He did not stop until he had terrorized at least three different individuals into providing Bretz what he demanded.  His online coercion of multiple people demonstrated a complete lack of basic human decency and a keen willingness to degrade others to satisfy his perverted desires.  This conduct alone justifies a sentence at the top of the guideline range.

    **2. History and Characteristics of the Defendant**

Unlike many of the defendants who come into federal court for sentencing, Bretz has described his upbringing as "normal." (PSIR paragraph 77).  He never endured any sexual abuse as a child and his basic necessities were provided for.  *Id.*  He is currently in good health.

Bretz has a history of "dropping out of services" for his mental health issues.  (PSIR, paragraph 83).  He has admitted to "never following through with treatment as recommended."

11

(PSIR, paragraph 82). Since Bretz has refused to address his mental health issues they should not be a basis for mitigation of his sentence. Perhaps if Bretz would have simply complied with his treatment recommendations, the victims would not have had to endure Bretz's harrowing coercion and cruelty.

Bretz also has a history of substance abuse for which he has not successfully sought treatment. Bretz has consistently failed to follow through with substance abuse treatment. He has scant if any real employment history.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.(quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.* The Supreme Court has long recognized that sexual abuse has devastating and long lasting effects on children. *New York v. Ferber*, 458 U.S. 747, 758 n.9 (1982). Indeed, four members of the Supreme Court deemed child rape to be so serious that death could be imposed as a punishment. *Kennedy v. Louisiana*, 554 U.S. 407, 447-70 (2008).

Bretz threatened and coerced multiple victims and possessed hundreds of items of young children being brutalized. A sentence at the top of the guideline range is appropriate and justified.

### 4. The Need for the Sentence Imposed to Afford Adequate Deterrence

#### a. General Deterrence is an Important Factor in Sentencing

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *Irey*, 612 F.3d at 1206, (citing *Ferber*, 458 U.S. at 760 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product"); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.")).

In fact, the Sixth Circuit has reversed a district court that failed to see any importance in general deterrence. *See United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012). The district court stated "general deterrence ... will have little [if] anything to do with this particular case." *Id.* The Sixth Circuit found the district court's statement "inexplicable and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]" *Id.* (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

The Court is in a position to send a clear message to the community that those who terrorize women online and collect child pornography will pay a very heavy price. The goal of deterrence is realized if even one predatory individual is deterred. A sentence at the top of the guideline range will accomplish this goal.

### b. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

This is the factor involving the incapacitation or specific deterrence of the defendant that the Court is to consider. *See Irey*, 612 F.3d at 1210. Since Bretz has a variety of problems it is easy to conclude that he will have a difficult time overcoming his predatory behavior and demonstrated sexual interest in young children. As a result, the Court should impose a significant guideline range jail sentence and a life term of supervised release in order to ensure that the danger to the community posed by Bretz is minimized as much as possible.

### 6. The Need to Avoid Unwarranted Sentencing Disparities

In *Goff, supra*, the district court sentenced a child pornography defendant to four months imprisonment despite an applicable guideline range of 37 to 46 months. The Third Circuit vacated the sentence and remanded for resentencing, holding that such a lenient sentence was unreasonable. *Goff*, 501 F.3d at 262. The court opined that the district court gave short shrift to the Sentencing Guidelines and did not properly consider a variety of § 3553 factors. Specifically, the district court did not adequately consider the nature and circumstances of the offense, the need to promote respect for the law, the avoidance of unwarranted sentencing disparities and affording adequate deterrence. *Id.* at 258. Goff downplayed the seriousness of the offense by implying that he committed a victimless crime driven by his curiosity. The Third Circuit emphatically rejected these claims. *Id.* at 258-59.

14

Goff also argued that he was entitled to a variance because he had never acted out in a sexual way with children. The Third Circuit vehemently disagreed with this argument, reasoning:

> He was not charged with molestation, so pointing out that he hadn't committed it is, in one sense irrelevant. In another more important sense, however, it does say something meaningful, albeit not what the defense intended. While the defense effort to draw a spectator-vs-participant distinction does not show that Goff's pornography crime was of less than ordinary severity, it does reemphasize that Goff failed to fully appreciate that severity. The simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.

*Id*. The Third Circuit was also thoroughly unpersuaded that Goff's supposedly exemplary life and charitable activities justified such a low sentence. The sentencing court's reliance on Goff's lack of a criminal history was also criticized because many child pornography offenders are first time offenders. *Id*. at 260-61. The Third Circuit also noted disapprovingly that the district court had failed entirely to consider deterrence when arriving at such a drastically low sentence for Goff. *Id*.

Similarly, the child pornography defendant in *United States v. Lychock*, 578 F.3d 214 (3d Cir. 2009), was sentenced to five years of probation and a $10,000 fine despite his guideline range of 30 to 37 months. The government appealed the sentence arguing that it was substantively unreasonable. The Third Circuit agreed and vacated the excessively lenient sentence. *Id*. at 221. Lychock argued that his sentence should have been affirmed because of his age (37), acceptance of responsibility and lack of criminal record. The Third Circuit was not convinced reasoning that none of these factors justified such a drastic deviation from the guideline range. *Id*.

The Third Circuit has also overturned, as excessively lenient and thus substantively unreasonable, a child pornography sentence of five years of probation to begin with six months

15

home confinement, along with a $2,500 fine, in *United States v. Hayes*, 383 F. App'x. 204 (3d Cir. 2010). Hayes' guideline range was 51 to 63 months. The sentencing court focused on Hayes' lack of a criminal history and supposed low risk of reoffending. His post arrest psychological treatment and family support were also significant factors in the far below guideline sentence. The district court also focused on the fact that Hayes had not actually sexually assaulted a child. *Id*. at 205-06. The Third Circuit found that none of these reasons justified such an excessively lenient sentence. *Id*. at 208. As a result, the Third Circuit vacated the sentence as substantively unreasonable and the case was remanded for resentencing. *Id*.

Bretz's case involves the horrible added component of the sextortion of three victims under circumstances clearly demonstrating his total lack of empathy and basic decency. The terror he inflicted on his victims alone warrants a sentence at the top of the guideline range. There is simply nothing mitigating in this case and Bretz's predatory conduct demands that he be removed from society for a lengthy period.

### F. Conclusion

Bretz coerced and terrorized multiple victims into providing him naked images. His coercive communications with these victims reveal a depravity and a hardness of heart that is difficult to comprehend. To make matters worse, Bretz recorded his awful intimidation of the victims and kept those recordings so he could relive his deplorable humiliation of these victim at any time. This Court should afford Bretz the same mercy he refused to give his victims.

His wickedness did not stop there though. He also amassed a collection of hundreds of items of child pornography. His illegal stockpile depicted young children being raped and sexually humiliated. He kept this material close, knowing full well that if caught, he faced

serious consequences. The costs of his unwavering predatory conduct pale in comparison to the horrible toll suffered by the victims whose abuse enthralled Bretz. He deserves a sentence at the top end of his applicable Guideline range.

                                             Respectfully submitted,

                                             SCOTT W. BRADY
                                             United States Attorney

                                             <u>s/Christian A. Trabold</u>
                                             CHRISTIAN A. TRABOLD
                                             Assistant U.S. Attorney
                                             PA ID No. 75013